We'll hear argument next in New York State Electric & Gas Corporation v. Century Indemnity and One Beacon American Insurance Company, 18-1012. Good morning, and may it please the Court, I'm David Elkin, and I'm representing the appellant, New York State Electric & Gas Corporation. The District Court's ruling should be reversed. The insurers recognized that the Court construed the evidence in their favor on their summary judgment motion. That was error. I want to focus now, though, we listed 14 separate reasons why all three of the notice rulings should be reversed. I want to focus on the three most important ones because they apply to all three of the rulings. The first point was the Department of Environmental Conservation, or DEC, made no demands on NYSEC that would have required notice. The entire time, there were two relevant communications, both with the same mid-level employee, Walter Demick. The first was in October of 86 when he insisted that NYSEC continue their investigations. We set forth many reasons why that wasn't the claim under the policy, and then three months later, he wrote NYSEC to say their investigations were satisfactory. The next relevant communication was six years later, two years after notice, when the DEC wrote NYSEC to request that they negotiate. So in 1986, there's a letter, maybe this is the one to which you're alluding, that says if NYSEC does not investigate the sites, the DEC will do the investigation and come to NYSEC as a responsible party for reimbursement. Is that the one that you were? I don't believe he said as a responsible party. They say it will come to him for clearance. That's the internal NYSEC memorandum. That's right. And NYSEC was already investigating those sites. No, no, no. I believe that that was a warning. And then in 1987, there's a letter to NYSEC telling NYSEC to submit plans for oversight and the consent orders would be handled by DEC lawyers. Is that also? That's correct. A couple of points there. The gentleman who wrote that letter in January was the same gentleman that purportedly made the demand in October of 86. His January letter says nothing about demanding that they consider their investigations. The other point is, he says in the letter that any remediation will be handled under a consent order, which NYSEC always expected. But nothing happened. The next relevant communication wasn't for six years. There is no case involving notice. Relevant communication. What is a relevant communication? Well, anything that involves the DEC even suggesting that NYSEC take actual measures. The DEC, when they wanted something done, always used a consent order. They never even sent a draft consent order to NYSEC. They were happy, apparently, with NYSEC's investigations. The DEC's ability to compel anything was engraved out at this point. That's why when they wrote NYSEC the letter asking them to negotiate a consent order, they didn't do standard practice naming them a potentially responsible party. They said, would you negotiate with us? It was an arm's length negotiation for a year because NYSEC could have walked away. You are saying that all the things that NYSEC was doing, with respect to each of these, with respect to Plattsburgh, with respect to the other five, phase one, let's leave a right for 16, that none of that amounts to something that under New York law required them to give, New York clients to give notice? Plattsburgh, the issues involving the tarpon disposal area, I will agree that notice should have been, well, I would agree they have an argument that notice should have been given and they declined coverage so long ago we couldn't pursue that claim. With respect to the issues involved in the operations area, NYSEC was unaware of the contamination until 1996. And they had given notice of the consent order in 94. In 96, when they found out about the contamination, they were giving updates on a regular basis to the insurance companies, which would have included Plattsburgh and would have been the equivalent of notice, although NYSEC's not an insurance company. They didn't label it as such. But when the insurance companies didn't even respond to notice in 1994 of the consent order, NYSEC didn't have to give them notice in 96, even though we believe they did. But the test is whether the circumstances known to the insured would have suggested to a reasonable person the possibility of a claim against the insurer, right? No, that's the test for a primary policy. That's only for a primary policy. But the district court got it wrong. I'm sorry? It's only for a primary policy. That's right. That's your position. Absolutely. The test for the excess. What's the standard for a notice of occurrence in an excess policy? The best case on point is the Morris Park case, the intermediate appellate court case, when the insured reasonably should have known that the claim against it would likely exhaust its primary insurance coverage and trigger its excess coverage. And that's consistent with the Second Circuit's decisions in WR Grace and in the Olin cases. The trouble is that the Second Circuit decisions and federal law in this really is not relevant. The real relevance is what New York law is. And I gotta say that I have a great problem figuring out what the appropriate standard is under New York law. Because you say that what is there for an ordinary policy doesn't apply for an excess. The language is clear as to an ordinary policy as to an excess. You have this case. It says something that I don't really know that something of that sort would not be. What does it mean to say in a situation like this that the claims are not likely to go beyond the ordinary policy? Your Honor, there's many ways to answer that. First of all, clearly excess policies are different than primary policies. Number one. No, they're different, but are they different? Well, the notice requirements. The reasonable person test, isn't it? Yeah. But of what? Morris Park says we- Recognize that this occurrence is likely to tap into the excess coverage, okay? We're talking about occurrences here that resulted in, and were I think reasonably perceived as resulting in serious environmental damages worth millions of dollars, right? Wait a second. I have so many responses to that. Let me try and get all of them in in my time. Yeah, your yellow's lights on. You better hurry. First of all, Morris Park makes clear there has to be a claim against us reasonably likely to reach the excess policy. The trial court said possibility of a claim. That's a different standard, the wrong standard. Second of all, what we were going to give notice of. Every investigation we did that went the furthest to the risk assessment phase left with our environmental consultant saying, don't do anything more. You say that it is not enough for an excess policy to have an occurrence that is likely to give rise to a claim that will go over the basic policy. That's what you're arguing. No, I'm not. But what do you cite me for that? Well, the Morris Park case is a standard I'm applying. We didn't know of an occurrence. We didn't even know that- Now you're saying something else. You see, before you were saying no claim. Now you're saying there isn't enough of an occurrence. And that's a different question. And maybe you're right, but that's, you know, before you were saying that you had to have a claim that would go over that. That's not what you're saying now. I'm saying all of that. Number one, we didn't have a claim. Number two, we didn't know of an occurrence because we didn't know damage happened during the policy period. There were no demands by the DAC for us to do anything. They spammed the district court with 256 exhibits. There was one letter asking us to do a partial investigation on one site. The DEC never demanded anything. They never discussed remediation of any of the phase one sites with us before we signed the consent order, until much after that, actually. We didn't know of an occurrence. We didn't know of a claim. The earliest we might have had a claim, maybe, was when we agreed to sign the consent order in 94. We gave them notice before we signed that, promptly. And even then, we didn't know of damages that would reach the excess level. We had nothing to give them notice of. We were voluntarily investigating the sites. We had no demands to do anything from the DEC. I see my time is up. And there was nothing for us to say. We were voluntarily investigating these sites before anybody. Thank you very much. You reserve two minutes of rebuttal. Good morning, your honors. May it please the court. John Hacker for century. I'll be doing the first five minutes. And then Mr. Netburn will be handling for one beacon for the other five minutes. To go straight to the question of the legal standard, I think the easiest way to address it is just rely on the language of the policies here, and not get caught up in verbal formulations in the case law. The policies here require notice, unambiguously, whenever an occurrence is, quote, reasonably likely to involve the policy. So that's the question, whether it's reasonably likely to involve the policy. And that's exactly what the court below applied, actually citing Morris Park, when he concluded that it was reasonably likely to exhaust the primary policy. And that reference to exhaustion is what incorporates the difference. Then you have the question of whether or not you waived. And that, again, is for me very difficult, because the question of what is a valid waiver in New York is a terrible mess. Because you have the New York Court of Appeals have the original, per se, rule. Then the New York Court of Appeals backs down from it, or seems to. And you have the appellate division acting as though it still is there. So that I'm left really quite uncertain as to what it is that New York Court of Appeals today requires here. So two questions, or two answers, rather. The first is, I don't think you should be uncertain. I think Keyspan is perfectly clear that the common law rule requiring an affirmative manifestation of an intent to waive. What case did you say? Keyspan. That's the Court of Appeals decision that says the common law rule applies and requires an affirmative, clear intent to waive. But more importantly, more importantly, this case is an easy one. If your honor has difficulty understanding what Keyspan says, it doesn't matter. Because in this case, with respect to Century, their only argument, literally, their only argument that we waived is mind boggling. What they say is we waived because there was a draft letter that listed the potential defenses, including late notice, that didn't get sent out. They say because there was a letter that was not sent, that that was a manifesting intent to waive. An unsent draft letter doesn't manifest anything at all when, in fact, what we did send out were clear letters reserving rights, including the right to assert a late notice defense. That's what was manifested. The fact that we internally had a draft, that's explained without contradiction. The reason there was a draft letter that mentioned it was Mr. Snyder, right, had the Plattsburgh draft, actual disclaimer in front of him, began to write a letter responding to the other sites, and then learned that they weren't asserting claims to the other sites. So he never finished it. And you're saying that there is enough of an occurrence with respect to the 16, not phase one, as well? Now Judge McAvoy lumps everything together. I mean, I see a situation with Plattsburgh, which is a very, looks like a pretty easy one, depending on whether you waived or didn't waive. With respect to the next five, well, it looks as though something's going on. With respect to the next 16, I just don't know. And I think a lot to me with respect to those depends on what is an occurrence? What is enough? Staying with a policy, but what is enough in New York? Well, what's enough under the policy is reasonably likely to involve the policies. And the record is absolutely consistent and clear, as Judge Loyer was getting at. Even with respect to the 16, if you just focus on the 16, they can never escape the documents that Judge McAvoy pointed to, including the 1989 memo, which you'll find at A38, internal NYSEG memo. No, notice of occurrence. The moment they start doing some things, even though it isn't clear that this is hazardous, and the definition of hazard starts to come up later, under this quite unclear New York law, they should have notified you with respect to the 16. As to an occurrence, I'm distinguishing an occurrence, right? Yeah, yeah, yeah. And as to the point about whether it wasn't clear it was hazardous, first of all, there was a consent order issued on Plattsburgh based on the exact same kind of- Plattsburgh- No, but it's the same contamination, right? Everybody acknowledged under the Plattsburgh consent order that there was legal liability for the contamination of MGP. And if you look at the record, what you see are repeated references from both DEC and- You say that because this happens in Plattsburgh, they're supposed to say, oh my goodness, as to things you're not investigating yet, as to all these other things, gee, something might happen, I'd better let all the insurance companies know, long before anything goes- No, I'm not saying that at all, Your Honor. I'm actually using Plattsburgh to answer the point about the idea that there wasn't clear regulatory authority. Of course there was. That's what they were negotiating and talking about through the 80s, starting with Plattsburgh, was DEC imposed liability through a consent order for MGP coal tar contamination. So we know there was potential legal liability to the facts, Your Honor, to the point about your question, I guess, was a hypothetical, because it has nothing to do with this case. This was not a situation where there was, gee, we don't know what might be going on. If you look at the documents consistently, starting with the 1986 memo, which you'll find at A705, they explicitly say if NYSEG does not investigate the sites, DEC will do the investigation and come to NYSEG as a responsible party for reimbursement. That's NYSEG saying they're coming after us unless we investigate. You see it over and over again, repeated communications. Well, this issue as late notice of claim, as I understand it, there is no dispute that that would then apply to all the sites. Is that correct? I don't know that there's no dispute on that. It certainly would apply. I don't know exactly what Mr. Elkin would say, but there was late notice of a claim as to all sites. There was also late notice of occurrence as to all the sites, because the 1986 document, the 1989 document that I was referring to, that describes all the sites. The 1989 document in particular, NYSEG budgets $25 million, your honor, $25 million to investigate and remediate to avoid and minimize liability. Again, it's not, gee, something might happen. They're spending $750,000 for every single one of the sites in 1989. Of course you would give notice to your insurer at that point. So it's financing for this specific purpose. Absolutely, they're a regulated entity trying to establish a budget so they can increase their rates. That's what's going on. In 1989, they budget $25 million and don't tell the insurers about the problem they're obviously quite aware of. I think we have the benefit of your argument. Thank you. We'll hear from Mr. Netburn. Thank you. May it please the court. My name is Peter Netburn. I represent One Beacon American Insurance Company. I'd like to just jump into a couple questions that the court has asked. And I think it shows in some ways how both One Beacon is similar, but slightly different from Century. The One Beacon policy is a little different than most excess policies. In fact, the One Beacon policy is not a true excess policy. The One Beacon policy sits above no dollars of primary property damage coverage. It sits above a $20,000 self-insured retention. It is effectively primary coverage. The other important thing to note is that the One Beacon policy requires notice of an occurrence as soon as practical. That's very different language. That is the language of the One Beacon policy. The other quick point I'd like to make is with respect to you, Judge Calabresi, was the issue of going from the six phase one sites to the 22 sites. And in its motion for reconsideration before the district court, NYSIG concluded the motion by asking the district court, and the easiest way, I apologize, is to read what NYSIG said. It said, NYSIG respectfully requests that the court amend the judgment to resolve any ambiguity that applies to all the sites at issue. In this action, this will enable NYSIG to proceed on appeal now. That's exactly where we are, Your Honor. There's certainly, NYSIG is certainly entitled to raise an issue as to whether or not there was late notice of a claim or late notice of occurrence. But the expansion of six to 22, that issue is waived. However, there is certainly evidence in the record to support all the non-phase one sites that there were occurrences and that there were claims. As far as occurrences, as of the time that notice was given, NYSIG had spent $4 million just to investigate and remediate 15 of the 16 phase one sites. The 16th site is quirky and they had no access to the property, so they couldn't do anything. For the Owego site, they had already spent $577,000 on the site. And you can go on through every one of them. They're in the record. Every one of the site summaries that were provided to the insurers listed the amount of money that they had spent. You're saying that that by itself says, given the language of your particular policy, is something that they should have given notice to. No, Your Honor. It starts a lot earlier than that. It starts in the late 1970s, early 1980s for NYSIG. It started with the Plattsburgh site, moved on to the Lockport site, and those two sites informed NYSIG that it had a very significant MGP pollution problem at all of its sites. And then in 1986, the DEC came. This is all based on a reading of that language and of New York law that says, if I've got a problem in one place, and that makes me think that I might have a problem in others, even though nothing has happened specifically with respect to the others. Let's assume I have to inform the insurance policies or I lose my policy. And that's a strong statement. That's a strong statement. If we think of it, not just in the particulars of this case, I learned that there is an accident, that accident law has changed, so that something that I did may be an accident in one, and I have to think about all the other things that I have done that then I might be liable for, or I lose my insurance, even though no one has come after me on those. You know, I don't say that that couldn't be New York law. I just, I don't see the cases quite that tell me that that's so. I would agree with your honor in the abstract, but a close review, as I'm sure the court has done. That's my problem. Of the record, shows that NYSEG's knowledge was evolving, starting with Plattsburgh, moving on to Lockport. You mean knowledge of occurrences, as opposed to knowledge of claims? Of all of its sites, your honor. It began this MGP program, started in the early 1980s. You're basically saying that whatever may be the case in other circumstances, this set of circumstances is such that under New York law, a reasonable insured would have said, hey, I'd better go tell my insurance companies right then and there. In the words of Judge Sullivan, I believe it was, the circumstances were such that a reasonable person certainly would have been on notice.  the possibility of a claim. Oh wait, you have the byproduct of the plant is this extremely toxic substance that contaminates groundwater, right? Yes, your honor. And that's true of every plant that they operated, right? They all made the same stuff. Yes, your honor. And so knowledge of this problem in one plant put them on notice for all the plants, right? That's what you're saying. No, your honor. What I'm suggesting is that Plattsburgh and then Lockport and then NYSEG, the document show began to investigate more and more of its sites. There were 38 sites. It began invest, it developed an MGP investigation plan to investigate all of its sites. It's not the experience at just the Plattsburgh site. That's what got the ball rolling internally for NYSEG. They realized there's a very serious pollution problem. And there's a potential. There is a potential for a pollution problem at every one of our former MGP sites. Don't you cut through all these problems, these issues that have been raised under a late notice of claim analysis? Yes, your honor. And the statute of limitations. The statute of limitations I think in some ways is the easiest. They signed a consent order for every one of their sites to investigate and remediate if necessary and to pay the oversight costs of the DEC in 1994. He was 19. Doesn't the statute of limitations starts to run when there is a request and the request has been denied? Yes. And NYSEG did ask. And one big. I must say, I have much more problem with that because you're in a way saying that they haven't even, that they didn't even give notice, that they didn't even make a request. So it's kind of hard for me to see the request having been made and having been denied when the whole talk is, are we covered or not? That is, you say the statute of limitation is easier. I must say, I find whether a reasonable person would give notice a much stronger ground. I would be happy with either. I know you would. Thank you, your honor. Thank you. Mr. Elkin. I have a lot to cover quickly. Counsel talked about the possibility. Elkin, the microphone. Sorry, counsel talked about the possibility and the potential of a claim. That doesn't apply to an excess policy. He says that their policy, he says that their policy is in this respect to be treated the same as a primary policy. It's an excess policy above a $20,000 retention. That's an excess policy. And you can tell that because it doesn't have a duty to defend that primary policies have. It's clearly an excess policy. They've conceded that. And the law is excess policies have a different notice requirement despite the language. Although centuries notice requirements were established by the appellate court in Brooklyn Union and they can't meet that test. What if the policy itself has language of something? You say that New York does not interpret that policy language to require that kind of notice where the policy is in fact an excess policy. Every New York decision in this court and in the appellate division on excess policies have a standard that's not language specific. That's right. I don't care about this court speaking about New York law because we usually get it wrong. The appellate division interests me and it is not the court of appeals. So I want to know what... We agree on that. Well, your honor, Morris Park is the best case on point. It's an appellate division case. Assume you had a deductible of $5 million and somebody tripped and fell on your property. Would you have to give them notice? I would hope not. And there's no evidence that Nisic had any instance here. Oh, he can talk about his possibilities. There's a difference of somebody tripping and you don't assume a $5 million degree of damage in a situation here where the damage that was being looked to was clearly above the $20,000. No, that's not true because we didn't even know damage had happened during their policy periods. It's not about what you know will be the liability. It's what is likely to be the liability. You're saying that it wasn't likely or probable that it was going to be more than $20,000? In their policy years, we would have no way of knowing that. Our people were charged with determining what is there and how we get rid of it. When it happened and how it happened, they're not experts. That's why we hired experts in this case. But we would have needed a claim under Morris Park reasonably likely to reach the excess policies. We didn't even know there was damage during the... And let me say one other thing. Claim case, right? That's about a notice of claim policy, right? No, it's not. It's about a similar situation as this. But another point is they made a big deal out of our budgets. Our budgets were for investigations, which we were doing 350,000. If something was remediated, which wasn't going to begin till the year 2000, it was $400,000. Under New York's allocation law, with these sites having over a hundred years of damage or Plattsburgh maybe 96, we would not have had a claim reasonably likely to reach the excess policy until we had over $2 million of damages plus liability. None of that happened. And we didn't know damage happened during the policy period. Did you say that Morris Park is not or suggest that Morris Park is not a notice of claim case? The court's decision, I believe, didn't construe notice of an occurrence requirement. If I'm wrong, I apologize. But clearly the Court of Appeals decisions, this court's decisions and Owen and W.R. Grace handled that. But the question- Let me show you, paint a different picture of what's going on and tell me whether that is wrong. You have this problem and you're digging into it. And as you go along, the cost of remediation and the number of places of remediation gets worse and worse and worse and worse. And at that point, you start to look rather desperately as to who can help you with this, whether the state can help you, whether this can help you. And it comes to mind that at some point, there were some insurance policies, the exact names of which you don't even know, we don't have them. But oh my goodness, there may have been somebody there who was, who can help us out in this. And at this point, you find policies. And at this point, you give notice.  is because you hadn't really even thought in terms of being insured against this. Well, you raise a very interesting point, Your Honor. I mean, I'm just telling one way that perhaps a lay person looking at what went on here could say, here's really what's happened. Well, there's a couple of answers to that, if I may. First of all, there's been a little misstatement. At the time we gave notice, we'd only performed remediation on only two sites. One was the Plattsburgh tar pond. And I wish I had time to discuss why. That's a very, it's the only place where NYSIG ever had intentional dumping. And clearly the case law mandates two occurrences there. But on top of that, there was only one other site where we had done remediation. In fact, NYSIG gave notice to its first layer insurance carrier at that time, Aegis, expecting them to provide coverage, okay? And that was it. But there was nothing else. NYSIG wanted to work with the DEC. The DEC is who refused to move forward. And we knew at some point, we may have to remediate these sites 12 years in the future. When you say the DEC is the one that wanted to move forward, why is that not a notice of claim under New York law? The DEC didn't want to move, is what I'm saying. We went to talk to them and nothing happened. They testified that when they wanted something done, they sent a consent order. That's how they work. We didn't even get a draft. The problem is the DEC- So I think we have your argument. Can I ask one question now? So in 1987 is when the primary carrier, Aegis, gets notified, right? It's current, then current first layer carrier, which is a very unique insurer. They insure public utilities and they offer like $35 million of coverage. So NYSIG looked to them on only the Plattsburgh tarpon issue. That was it. Just the Plattsburgh tarpon, not on any other site. If there's- Sorry. I also have one more question. With respect to the notice of claim, as I understood it, it's undisputed that if the analysis, if you lose on that basis- On the claim issue? On the claim issue, then it applies to all the sites. Is that correct? That's right, but there are seven reasons, each of which independently shows there wasn't a claim. Oh, no, no. So we've got the benefit of that. I just want to- Seven reasons means there wasn't a claim. There's no question there was no claim. Thank you very much. We'll reserve the decision.